ALBANY,
August, 1820.

CHANDLER
v.
BELDEN.

## CHANDLER & TALBOT *against* BELDEN.

TROVER for 7,500 bushels of salt, tried before Mr. Justice *Van Ness*, at the *New-York* sittings, in *December*, 1816.

From the evidence stated in the case, it appeared that on the 11th of *July*, 1815, *Clark & Ingersol*, and *Luther Bingham*, entered into a written agreement with the defendant, by which they agreed to put on board the ship *Carrier*, at *Turks Island*, fifteen thousand bushels of salt, or as much as the ship could carry, at the *freight* of 35 cents per bushel, 500 dollars to be paid in advance, and the balance in three equal payments, at 30, 60, and 90 days, from the arrival of the vessel at *Quarantine*, in *New-York :* and *C. & J.* and *B.* agreed to receive the salt, in fifteen days after the arrival of the vessel at the dock, in the port of *New-York.* The *five hundred* dollars were paid to the defendant in advance. The master of the *Carrier*, executed a bill of lading, dated in *Turks Island*, the 6th of *November*, 1815, for ten thousand nine hundred and forty-seven bushels of salt, to be delivered at *New-York*, to *Luther Bingham*, or his assigns, " he or they paying freight for the same as per agreement." This bill of lading was indorsed by *Bingham* to the plaintiffs ; the indorsement was dated *November* 24th, 1815, but there was contradictory evidence as to the time of the assignment. From the entries in the books of the plaintiff, as well as the evidence of some of the witnesses, it must have been in *December*, and some time between the fifth and twentieth day of that month. A witness. for the plaintiffs testified, that they had purchased of *Bingham* six thousand bushels of salt, about the 26th of *No-*

The right to retain goods for the freight, grows out of the usage of trade ; and does not exist where the parties have, by their agreement, regulated the time and manner of paying the freight, especially where the cargo is to be delivered before the time fixed for the payment of the freight.

The legal property in goods passes by a bill of lading, and an assignment thereof, *bona fide*, and for a fair consideration, though the assignment be made after the arrival of the goods in port : and where the ship owner, not having a *lien* for the freight, sold the goods at auction to pay freight, it was held to be a conversion of them, and that trover would lie at the suit of the person to whom the bill of lading was assigned.

*vember*, when they paid him 1,600 dollars in advance. The vessel arrived the 22d of *November*, 1815. *Clark & Inger-sol* who were to have one half of the salt, received five thousand bushels, which was more than half, as the cargo turned out only eight thousand eight hundred and eighty bushels; *Bingham* had given an order on the captain, in favour of *Wm. Dodge & Sons*, for two thousand bushels, which was accepted by the master on the 29th of *November*, a part delivered on the 1st of *December*, and the residue between the 11th and 14th; the delivery having been interrupted by a seizing of the vessel, on the 2d of *December*, under a bottomry bond, which was paid on the 5th of *December*. The defendant resided at *Hartford*, in *Connecticut*, and came to *New York* on the 4th or 5th of *December*. There was some contrariety of testimony as to the time when the plaintiffs presented the bill of lading, and demanded the salt. The weight of evidence was, that a demand was made of six thousand bushels of salt, of the measurer on board of the vessel, on the 9th of *December*, and of the mate, the captain being absent. and refused. After the delivery of the salt to *C. & I.* and to *D.*, being seven thousand bushels, *Clark & Ingersol* directed the agent of the defendant, to retain the residue of the cargo for the payment of the freight which, according to the agreement, amounted to 3,108 dollars. The residue of the salt was sold at auction, and produced 1 179 dollars and 45 cents; it was purchased by the agent of the defendant for his account. One of the witnesses testified, that a demand of the salt was made by the plaintiffs, from the defendant, about two days after the arrival of the vessel, which was refused, the defendant saying that *C. & I.* were insolvent, and *Bingham* a bankrupt, and that he would not deliver the salt, unless the freight was paid or secured to him, and that the plaintiffs declined paying or securing the freight. The assignment of the bill of lading to the plaintiffs was absolute, and for a full consideration. *William Clark*, one of the firm of *Clark & Ingersol*, was offered as a witness by the defendant, but he was rejected by the judge. It appeared that *Bingham's* notes were protested at the bank, for non-payment, on the 24th of *November*, and his bonds at the Custom-House were unpaid.

The judge charged the jury: 1. That admitting the insolvency of *Bingham*, the defendant, under his agreement, had no *lien* on the cargo for the payment or security of the freight: 2. That the defendant's remedy was good against *C. & I.* who did not appear to be insolvent: 3. That the property having passed by the assignment of the bill of lading, the plaintiffs were entitled to recover: 4. That the only question was as to the quantity; and as *Bingham's* part was only claimed, if the endorsement of the bill of lading was made at any time before the 8th of *December*, the plaintiffs had a right to recover *B 's* share, unless they had consented to the delivery of the salt to *Dodge*: 5. That the demand by the plaintiffs, on the 9th of *December*, was sufficient; and the Captain was not then on board. Admitting that the defendant was not in *New-York*, until the 4th of *December*, which he thought was established by the testimony; yet the circumstances would justify an inference of a demand made after that time of the defendant. The jury found a verdict for the plaintiffs, for the 1,880 bushels of salt, viz: 1,519 dollars and 34 cents.

A motion was made to set aside the verdict, and for a new trial.

*Hoffman*, for the defendant. 1. The endorsement of the bill of lading having been made after the vessel had arrived in port, and when there might have been an actual delivery of the salt, did not transfer the property to the plaintiffs. The endorsement or transfer of a bill of lading merely passes the property in goods *at sea*, when there can be no actual delivery of them. Such an assignment transfers only an equitable right of possession; and the assignee must get the actual possession of the goods, as soon as possible. The principles of law on this subject are clearly laid down by Mr. Justice *Buller*, in the opinion delivered by him in the case of *Lickbarrow* v. *Mason*, in the House of Lords. (6 *East*, 21. in note.)

2. The defendant was not bound to deliver the salt, until the freight was paid, or secured to him. To maintain *trover*, the plaintiffs must show an absolute legal property in the goods. If there was any conversion at all by the defend-

ant, it was before the assignment of the bill of lading, which merely transferred a right of action. The assignment was not, in fact, made before the 19·h of *December ;* for there was no consideration paid before that time. But admitting that the assignment transferred the right of property, it must be subject to all legal claims against the assignor, in respect to the property. When the original agreement was made, *C. & I.* and *B.* were solvent; but when the goods arrived, *B.* was insolvent, and that fact was known to the plaintiffs when they took the bill of lading. The plaintiffs, therefore, can stand in no better situation than *B.* himself would have done; and he would never be allowed to take the goods out of the possession of the ship owner, without paying the freight. *(Hutton* v. *Bragg,* 2 *Marsh. Rep.* 339.) The agreement contemplates the solvency of *C. & I.* and *B.* ; and the doctrine as to the right of stoppage *in transitu,* may be applied in this case. Though there was an agreement on the part of the owners of the goods, that they would *receive* them in fifteen days after the arrival of the vessel at the dock ; yet there is no contract on the part of the defendant that he would, at all events, *deliver* them within that time. The master, or ship owner, is not bound to part with his *lien* on the goods, unless there is an express stipulation to that effect.

3. *C. & I.* and *B.*, who were joint owners of the cargo, directed the residue to be sold for the payment of the freight. Now, if the transfer of the bill of lading was subsequent to this direction, there is an end of the case.

4. The endorsement of the bill of lading was fraudulent. It was antedated, and was not made until after the sale or conversion. (Here the counsel discussed the evidence in the case.)

5. There was not evidence of a sufficient demand and refusal. The only demand was on the 9th of *December,* and that made of a *measurer,* an officer of the custom-house, without showing any paper or permit. The demand should have been made of the master, or of the defendant, who was then in the city. The mate is not the agent of the owner. The measurer has no power to deliver, without an order or permit from the custom house.

6. *Clark* was a competent witness, as he stood indifferent between the parties.

*Wells*, contra. Whether the assignment of the bill of lading transferred the property in the goods or not, is immaterial in the present case, as here was an actual and *bona fide* sale of the property to the plaintiffs, independent of the transfer of the bill of lading. If there was an absolute sale, the plaintiffs have a sufficient right of property to maintain trover. But, ever since the case of *Lickbarrow* v. *Mason*, it has been the settled law, that a bill of lading is transferrable like a promissory note ; and when endorsed, *bona fide*, transfers the legal title to the goods. Not an exception to this rule has been shown. In *Judah* v. *Kemp*, (2 *Johns. Cases*, 411.) there was an assignment of the bill of lading after the arrival of the goods ; yet the distinction which has been suggested did not occur to the counsel, or the Court, in that case. The true time of the endorsement of the bill of lading was a matter of fact for the jury to decide, and they have decided upon it. In *Hòllingworth* v. *Napier*, (3 *Caines' Rep.* 182.) where the vendee had a bill of parcels, and an order from the vendor, on the storekeeper, for the delivery of the goods to him, this was held a sufficient delivery, to destroy the right of stoppage *in transitu*, as against the *bona fide* purchaser, for a valuable consideration. *Bingham* was the sole consignee of the cargo of salt. He had a legal title to the whole ; but the plaintiffs claim only the half belonging to *B.* If the plaintiffs are entitled to recover at all, they have recovered the least possible quantity.

The only question in the cause is, as to the right of the defendant to retain the goods until his freight is paid. This right grows out of the usage of trade, and is created by law ; but when the parties make a special agreement for the payment of freight, no legal *lien* exists. The contract shows, that the freight was not to be paid until long after the delivery of the goods.

SPENCER, Ch. J. We are satisfied that there was no *lien* in this case.

*Hoffman.* But the insolvency intervening, materially alters the case.

*Wells.* But the parties should have provided against the contingency of insolvency. If they have not, they can look only to the personal responsibility of the shippers. Third persons are not to be affected by that circumstance. But there is no evidence of the insolvency of *C. & J.,* and not very clear proof that *B.* had become insolvent, though he may have been in failing circumstances. As to the sufficiency of the demand; the salt was in the actual course of delivery, and the demand was necessarily made on board of the vessel, and of the person who had charge of the vessel, and the special custody of the property, in the absence of the master, and whose peculiar duty it was to see to the delivery of the cargo. Besides, the defendant merely claimed to retain for freight; he made no objection to the want of authority in the plaintiffs to receive the salt.

*Clark* was clearly an incompetent witness; he was interested with *J.* in the original adventure, and *C. & J.* had made themselves liable for the whole freight; *C.* was interested, therefore, to diminish the amount of that liability.

SPENCER, Ch. J. delivered the opinion of the Court. 1. The defendant had no lien on the salt for the freight. By the charter party, 500 dollars was to be paid immediately, and it was paid. The balance of the freight was to be paid in three equal payments, at thirty, sixty, and ninety days from the arrival of the vessel at quarantine in the port of *New-York ;* and *Clark, Ingersoll* and *Bingham,* the owners of the salt, stipulated to receive the salt in fifteen days after the arrival of the vessel at the dock in *New-York.* The right to retain the cargo for the freight has grown out of the usage of trade, and it does not exist, nor can it be enforced, when the parties have expressly regulated the time and manner of paying freight, by stipulations in a charter party, and especially, if the cargo is deliverable before the arrival of the periods of payment. Such an agreement is an express re-

nunciation of the right to insist on freight before the cargo is delivered. (*Com. on Contracts*, 359, 360. *Doug.* 104. *Abbot*, 228. 259.) It is very manifest, in this case, that the defendant meant to waive the right of lien.

2. Had the plaintiffs a legal title to any portion of the salt?

It cannot admit of a doubt, that the assignment of the bill of lading, *bona fide*, and for a fair consideration, will vest the legal interest of the consignee in the assignee, although the assignment be made after the arrival of the goods. Such assignment amounts to a sale and delivery, and cannot be impeached by the carrier of the goods, who has no lien on them, nor any interest in questioning the validity of the transaction. The evidence in the case furnishes full proof of an adequate consideration for the assignment of the bill of lading, although it remains very doubtful when, in point of fact, the assignment was made. The plaintiffs have recovered only for 1880 bushels of salt, and have thus affirmed the delivery to *Clark & Ingersoll* of 5000 bushels, and to *Dodge* of 2000 bushels, as a legal delivery, and have only made the defendant answerable for what remained. It is not then material to inquire on what particular day the bill of lading was assigned. That it was assigned some time in *December*, 1815, cannot be controverted.

If the defendant had not a right to retain the cargo for the freight, on what ground can he be justified in doing it? It is alleged that *Kimberly*, the defendant's agent, proved that he was directed by *Clark & Ingersoll* to retain and sell the residue of the cargo for the payment of the freight. It appears that *Clark* and *Ingersoll*, & *Bingham* entered into the charter party as parties of the one part, with the defendant. The whole cargo was consigned to *Bingham* alone. He was, therefore, the ostensible and legal owner. It is, however, shown, that *Clark & Ingersoll* were entitled to one half of the cargo, and they took more than their proportion. This was a surrender of their interests; and they had no right or authority to direct *Bingham's* part of the cargo to be sold. The sale itself amounted to a conversion; and if it remained doubtful whether there had been a legal demand of the salt whilst it was on board the vessel, the act of sending the

salt to auction, which is certainly chargeable on the defendant, would be a conversion; and, at that time, the plaintiffs indisputably had a legal right to the salt.

Motion denied.