## Case No. 12,589.

### SEARS et al. v. FOUR THOUSAND EIGHT HUNDRED AND EIGHTY-FIVE BAGS OF LINSEED.

[1 Cliff. 68.] [1]

Circuit Court, D. Massachusetts. May Term. 1858.

#### AFFREIGHTMENT — LIEN — DELIVERY — CHARTER-PARTY.

1. Where a portion of a cargo was delivered to the consignee, to be reshipped, and was accordingly shipped to another port, and the residue delivered to him without qualification, under the circumstances of this case, *held*, that the ship-owners' lien upon the part last delivered was displaced, notwithstanding a clause in the charter-party that "freight should be paid, one half in five, balance in ten days after discharge in Boston; said credit on payment of charter not to impair ship-owners' lien on cargo for freight."

2. A carrier may, if he sees fit, deliver a part of a particular shipment, without impairing his right to hold the residue for the freight upon the whole consignment from which the part so delivered was taken.

3. Inasmuch as the delivery in this case was unconditional, the word "discharge" in the clause above quoted was held to refer to the unlading of the goods.

Appeal in admiralty from a decree of the district court of the United States for the

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.].

district of Massachusetts. The libel was in the usual form of a libel in rem in a cause of contract civil and maritime, and was filed on the 17th of December, 1857, by Paul Sears, on behalf of himself and the other owners of the ship Bold Hunter, to recover a certain amount of freight earned by the ship on a voyage from Calcutta to Boston. On the 5th of March, 1858, Rufus Wills, as administrator of Augustine Wills, deceased, intervened for his interest in the goods described in the libel, and prayed restitution of the same, with costs. A decree dismissing the libel, with costs for the claimant, was entered in the district court. [Case unreported.] All the material facts of the case were agreed between the parties, and were in substance as follows. In October, 1856, the libellants, owners of the ship before named, chartered her to Tuckerman, Townsend & Co. for a voyage from Calcutta to Boston, at the rate of fifteen dollars and fifty cents for whole packages, and half that rate for loose stowage. The charter-party contained the usual lien claims, and stipulated that freight should be paid, one half in five days and the balance in ten days after discharge in Boston; said credit on payment of charter not to impair ship-owners' lien on cargo for freight. On arrival at Calcutta, the charterers failed to furnish an entire cargo, but procured some shipments, or freight, and among others, one to Augustine Wills of Boston, of a large amount, for which the master signed bills of lading in the usual form, at various rates of freight for different kinds of merchandise, and all less than the rates specified in the charter. The vessel arrived in Boston, October 12, 1857, and soon after commenced discharging. Meanwhile the charterers had passed over the bills of lading of the merchandise to the libellants, in part settlement of the charter-money; and the libellant first named undertook to attend to the collection of the freight. At this time Augustine Wills was sick, and his business was transacted by the claimant, his brother, who acted as his agent. On the 2d of November, 1857, Augustine Wills died, and the claimant was appointed his administrator during the same month. Before the decease of the consignee the ship had commenced, and she completed the discharge of her cargo on the 7th of November. Before the death of the consignee, all the goods consigned to him were taken possession of by the claimant as his agent, and after his death they were retained by the claimant as the representative of the estate of the deceased. The larger portion of the merchandise was discharged at the claimant's request, and without being landed was, with the owner's consent, put into the Cyclone, bound to London, the claimant having informed the owners of the vessel, at the time of the transshipment, of his intention to reship the goods. Such of the cargo as remained was discharged, and delivered to the custody of the claimant or his agent, was by them conveyed to the custom-house stores, and there entered in bond in the name of Augustine Wills. Nothing was at any time said by the owners of the Bold Hunter of their intention to hold the goods, or any part thereof, for the freight, but the goods were all discharged and delivered without qualification. Before the death of Augustine Wills, the claimant, as his agent, at the request of the libellant, Sears, who represented that it would be an accommodation, paid Sears five thousand dollars on account of the freight. After the decease of Augustine Wills, and after the discharge was completed, Sears applied to the claimant for the balance of the freight, and was informed that nothing could be done until administration was taken out, when he hoped it would be satisfactorily adjusted, or words to that effect. Other applications for payment were made after the expiration of the five and ten days, and after administration was taken out, to which the respondent answered that he was not sure how the estate would turn out, and that he could not safely pay while any doubt remained. On one occasion, when applying for payment, the libellant replied, that he had been blamed by the other parties in interest for not holding on to the goods, and supposed he had lost his lien. This statement was not admitted by the libellant, though he consented to have it presented, reserving the right to require proof thereof, if the court should deem it material. It was also agreed that the shippers, Wills & Co. of Calcutta, knew that the ship was under charter, and shipped goods to other parties besides Augustine Wills, the consignee, who was not a member of Wills & Co., but doing business on his own account in Boston. Upon these facts, and the inferences to be drawn therefrom, if the court was of the opinion that the lien was lost, and the libellants were not entitled to hold the goods libelled for freight, then the libel should be dismissed with costs; otherwise, libellants were to have judgment for the balance of freight, with interest and costs.

F. C. Loring, for libellants.
Story and May, for claimant.

CLIFFORD, Circuit Justice. It is insisted by the libellants that the goods consigned to Augustine Wills were discharged from the vessel and delivered to his agent without any intention on either side that the lien or privilege of the carrier should thereby be waived or impaired. On the part of the respondent, it is insisted that by the delivery of the goods under the circumstances of this case the libellants waived their right to any lien thereon, and must rely upon the personal responsibility of the consignee. Some ground of inference that it was the intention of the libellants to waive the lien on the delivery of the goods, is afforded from the admitted fact that they

consented, without reservation, after the vessel arrived at her port of destination, to allow the consignee or his agent to reship a large portion of the consignment to the London market for sale. All that portion of the goods were not landed from the vessel, but were transshipped into the Cyclone, which was lying alongside for that purpose, and with a perfect understanding between the parties that they were to be sent out of the jurisdiction of the federal courts. They were delivered without objection and without any arrangement in respect to the balance of freight, which remained unpaid. Delivery under such circumstances, especially when accompanied by part payment of the freight, as in this case, must be considered as a relinquishment of the lien upon the goods so delivered. That conclusion rests upon two grounds, either of which is sufficient for its support,—first, that the delivery was unconditional, and was made under circumstances clearly indicating an intention that the lien should be displaced; and, secondly, because the libellants well knew that the goods were designed for sale, and that in the usual course of business they would immediately pass into the hands of innocent purchasers. It may then be assumed that the goods delivered to be reshipped to London were fully discharged of all claim for the balance of the freight remaining due to the libellants. That circumstance, however, is not conclusive in respect to those which remained, as a carrier may, if he sees fit, deliver a part of a particular shipment, without impairing his right to hold the residue for the freight upon the whole consignment from which the part so delivered was taken. A delivery of a part of the goods, therefore, without the payment of freight, cannot affect the question under consideration, except so far as the attending circumstances afford a ground of presumption, in connection with the other facts and circumstances in the case, that it was the intention of the libellants to relinquish the lien upon the residue; and it is proper to remark, that those attending circumstances, standing alone, would clearly be insufficient to justify that conclusion, and if nothing more appeared to support that view of the case, the libellants would be entitled to prevail in the suit. But those circumstances do not stand alone, as the subsequent conduct of the libellants abundantly shows. They did not retain the possession of the residue of the goods after the Cyclone departed on her voyage. All that remained were discharged early in November, and were unconditionally delivered into the custody of the claimant as the representative of the consignee, and were by him placed in warehouse, and there entered in bond in the name of the original consignee.

Discharge and delivery were commenced shortly after the vessel arrived at her port of destination, which was on the 12th of October, 1857, and were fully completed on the 7th of November following. Nothing was said at any time by the owners of the vessel, either during the discharge and delivery of the goods or afterwards, of their intention to hold the goods or any part of them for the freight, and the case furnishes no ground to infer that any attempt was made to negotiate any arrangement to that effect. On the contrary, it is expressly agreed between the parties, that the goods were all discharged and delivered without qualification. Administration on the estate of Augustine Wills was taken out by the claimant, in November, 1857, and more than four months elapsed after his appointment before the libel was filed. All the goods not reshipped remained throughout that period in the custody of the claimant, as administrator of that estate, and were claimed by him as belonging to the estate of the decedent. After his appointment, the libellants made application, in repeated instances, for the payment of the balance of the freight, which was refused or declined by the claimant as often as it was made, and yet it does not appear that the libellants even so much as intimated, on any one of those occasions, that they had any lien upon the goods described in the libel. On one or more occasions, when those applications were made, the libellants were informed by the claimant that he would not pay their demand, until it was ascertained how the estate was likely to turn out; and there is much reason to infer, from the statement of facts, that the doubts which have since arisen as to the solvency of the estate have had too much influence in convincing the libellants of the justice of their case. Five and ten days' credit was given by the charter-party for the payment of freight, after the goods were discharged in Boston, and it was stipulated that the credit so given, on the payment of the charter, should not impair the lien of the ship-owners on the cargo, for freight; and, therefore, it is insisted by the counsel of the libellants, that the case does not show an absolute delivery of the goods, which it is admitted would furnish strong, if not conclusive, evidence of a waiver of the lien. Two errors, however, are observable in the reasoning by which that conclusion is reached, which will now be pointed out. In the first place, the counsel assumes that the word "discharge," as used in the charter-party, is equivalent to the word "delivery," and that the credit contracted to be given for the freight was five and ten days after the goods were delivered to the consignee at the port of destination. Such are not the words of the charter-party, and the construction assumed, in the opinion of the court, would be unwarranted and unreasonable, as its effect would be to defeat the lien altogether. Ship-owners, so long as they continue in possession of the ship, are in possession also of the goods carried by her, and their right to a lien on the goods for the freight due in respect to such goods, whether by charter-party or under a bill of lading, is beyond question. They may, if they think proper, part with that posses-

sion, and relinquish their right to hold the goods; and in general the lien is not supposed to exist where the parties have, by their agreement, regulated the time and manner of paying the freight, so that the cargo is to be absolutely delivered before the time fixed for the payment of freight. Abb. Shipp. (5th Am. Ed.) 365; Chandler v. Belden, 18 Johns. 157. Judge Story accordingly said, in the case of The Volunteer [Case No. 16,991], that it is well known that, by the common law, there is in general a lien on the goods shipped for the freight thereon, whether it arise under a common bill of lading or under a charter-party, but that this lien may be waived by consent; and in cases of charter-parties it often becomes a question whether the stipulations are or are not inconsistent with the lien, as, for instance, if the delivery of the goods is, by the charter-party, to precede the payment or security of payment of freight, such a stipulation furnishes a clear dispensation with the lien for freight, for it is repugnant to it and incompatible with it. That case was cited and approved in Raymond v. Tyson, 17 How. [58 U. S.] 61, decided by the supreme court in 1854, where the same doctrine was distinctly reaffirmed. A similar question was again presented in this circuit in the case of Certain Logs of Mahogany [Case No. 2,559], and the same learned judge held that the word "discharged," as used in the charter-party, then before him, referred to the unlading of the goods, and not to the delivery of the cargo; and he admitted, in that case, also, that a contrary construction would defeat the right of the owners to any lien for freight. This view of the question also derives support from the language employed in the bill of lading, which is made a part of the case. By a fair construction of the bill of lading, the freight was payable at the same time that the goods were delivered. According to its material words the goods were to be delivered at the port of Boston, "unto Augustine Wills or to his assigns, he or they paying freight for the goods at the rate of eleven dollars per ton." Payment of freight and the delivery of the goods were obviously required by that instrument to be contemporaneous. and there is nothing in the language of the charter-party inconsistent with that view of the contract. These considerations lead necessarily to the conclusion that the word "discharge," as used in the charter-party, referred to the unlading of the goods after the arrival of the vessel, and not to the delivery of the consignment to the consignee, and that the parties did not stipulate for any credit upon the freight after the goods were delivered. In the second place, the argument for the libellants fails to give full force and effect to that part of the statement of facts wherein it is agreed by the parties that the goods were all discharged and delivered without qualification. All the authorities in the jurisprudence of the United States agree that an absolute delivery displaces the lien, and turns the party over to his remedy against the shipper or owner of the goods. That principle is so definitely settled in the courts of this country, that any examination of the authorities is unnecessary. They were delivered in this case without qualification, and so the parties have agreed; and it is difficult to see in what respect the delivery described in the agreed statement differs from that absolute delivery which all admit discharges the lien. Words more explicit or more comprehensive to express the act of absolute delivery could not well be selected, and when considered in connection with the subsequent conduct of the parties in respect to the same subject-matter, they must be regarded as decisive of the question.

The decree of the district court, therefore, is affirmed, with costs.